UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                 :
ALSON ALSTON,           :
           :
                           Plaintiff,       :          08 Civ. 3547 (SHS)
            :
            :          <u>OPINION AND ORDER</u>
         -against-             :
            :
MICROSOFT CORP.,          :
            :
                          Defendant.     :
            :
------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

*Pro se* plaintiff Alson Alston brought this action against Microsoft Corporation and ten individual Microsoft employees. Plaintiff alleges that Microsoft wrongfully terminated his employment due to his race and his disability in violation of the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964 ("Title VII"). The parties have now filed extensive submissions on cross motions for summary judgment on the wrongful termination ADA and Title VII claims.[1] Because Alston has failed to present evidence of any genuine dispute of material fact that could allow a reasonable factfinder to find in his favor, his motion for summary judgment is denied and Microsoft's motion is granted.

---

[1] Plaintiff also originally alleged claims pursuant to the New York City and New York State Human Rights Laws, as well as various ADA and Title VII claims, but in 2009, Judge Denny Chin, to whom this action was then assigned, dismissed each of those claims except for the wrongful termination claims against Microsoft Corporation. *See Alston v. Microsoft*, No. 08 Civ. 3547, 2009 U.S. Dist. LEXIS 39662 (S.D.N.Y. April 27, 2009). Specifically, Judge Chin dismissed the New York City and State Human Rights law claims for lack of subject matter jurisdiction, *id.* at *14, determined that "all of the alleged discrete acts except for Alston's discharge are time-barred," *id.* at *17, and dismissed the Title VII and ADA claims against the individual defendants because individuals are not subject to liability under Title VII or the ADA, *id.* at *19 n.2.

**I.     BACKGROUND**

   *A.     Plaintiff's Employment at Microsoft from 1995 to April 2003*

Plaintiff, who is African-American (Ex. C to Decl. of Rosemary Alito dated August 18, 2011 ("Alito Decl.") at 4), began his employment with Microsoft in 1995 as a Senior Applications Developer in its Issaquah, Washington office. (Def.'s Local Civil Rule 56.1 Statement of Undisputed Facts ("Def.'s 56.1") ¶ 1); (Pl.'s Local Civil Rule 56.1 Statement of Undisputed Facts ("Pl.'s 56.1") ¶ 1.) Plaintiff remained in Issaquah for two years before transferring to Microsoft's Consulting Services practice in Washington, D.C. to work as a Senior Consultant. (Deposition of Alson Alston dated August 13, 2009 at 41:10-41:14 ("Alston Dep."), Ex. A to Alito Decl.) He started as a "Senior Consultant I" and was later promoted to "Senior Consultant II." (Ex. A to Alito Decl. at 42:1-42:7.) In August of 1999, plaintiff transferred to Microsoft's Financial Services Practice in New York City. (Def.'s 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.) The parties dispute whether plaintiff's position in New York was at the Senior Consultant I or Senior Consultant II level. (Def.'s 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.)

   *B.     Plaintiff's Extended Leave of Absence from April to September 2003*

Alston claims that, in 2003, while still employed in the Financial Services Practice, he became ill while on an assignment in Miami. (Compl., Ex. C to Alito Decl. Part II.E ¶¶ (f), (g); Def.'s 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.)[2] On April 15, 2003, plaintiff sought and received approval for a five-week leave of absence. (Ex. J to Alito Decl. D000000199-200.) Plaintiff subsequently requested and received approval for five separate extensions of that leave, resulting in a paid leave of absence of five months between April and September 2003. (*Id.* at D000000201-13.) In each

---

[2] Plaintiff states in his Local Rule 56.1 Statement that he "partly affirm[s], partly den[ies]" Microsoft's statement in paragraph 4 of its Local Rule 56.1 Statement. (Pl.'s 56.1 ¶ 4.) Although he states that Microsoft's assertions are "false and misleading," and provides a detailed account of the trip to Miami, he does not dispute the essential facts of Microsoft's statement. (*See* Pl.'s 56.1 ¶ 4.)

2

of plaintiff's leave requests, on a Microsoft "Statement of Impairment" form, plaintiff's physician, Dr. Ronald Davidson, wrote that plaintiff exhibited "[s]ymptomatology related to poorly controlled Hypertension and diabetes" including "In ability to focus, to reduced ability concentration, Headaches, discomfort, shortness of breathe [sic] upon exertion," which "impact[ed]" his "ability to work." (*Id.* at D000000199, D000000201, D000000204, D000000206, D000000208, D000000212.) His doctor set forth in his last "Statement of Impairment" form dated August 1, that his estimate of when Alston "will be able to resume employment" was August 30, 2003. (*Id.* at D000000212.)

Three weeks later, Microsoft wrote Alston that it anticipated that he would return to work on September 2, 2003. (Ex. K to Alito Decl.) Microsoft added that, due to business needs, it would also begin to take steps to fill his position. (*Id.*) After receiving the letter, plaintiff contacted Microsoft's Human Resources manager and began to make arrangements to return to work. (Exs. L, M to Alito Decl.)

One week after Microsoft sent the letter to Alston, his physician provided Microsoft with a medical release indicating that plaintiff was being released by the doctor to return to work on September 15, 2003, but that he "should not work more than 40 hours per week (including traveling time), should be kept out of job related stressful situations, such as intense interpersonal interactions and high profile presentations . . . " (Ex. N to Alito Decl.) The doctor wrote that these restrictions had an "expected duration" of one month. (*Id.*)

In an email to plaintiff, Microsoft agreed to temporarily accommodate these restrictions by allowing Alston to work no more than 40 hours a week, and exempting him from making high profile presentations. (Ex. O to Alito Decl.) However, Microsoft noted that "the job and level of a Senior Consultant typically requires working more than a 40-hour work week and outside of a 9-5

schedule due to the demands of customers who require the needs of their project schedules to be met." (*Id.*)  The email stressed the realities of Alston's job requirements, explaining that "because you are a Consultant that lives remotely, travel is required due to the fact that you need to be onsite at customer locations . . . ." and that " a Senior Consultant will, at times be required to give high profile presentations and on short notice." (*Id.*)  Microsoft emphasized that "[t]he restrictions your doctor has suggested as accommodations will mean you are not performing essential job functions of a Senior Consultant II.  Accordingly, this accommodation will be temporary." (*Id.*)  Alston's response to Microsoft's email expressed his agreement with Microsoft's approach: "I should also state that, per our last telephone conversation, these constraints represent a mutually satisfactory business interpretation of my doctor's actual restrictions . . . ."  (Ex. P to Alito Decl.)

    C. *Plaintiff's Return to Work in September and October of 2003*

  Shortly before plaintiff returned to work, plaintiff learned that his supervisor, Albert Kim, would not be awarding him a bonus based on his performance that year.  (*See* Ex. Q to Alito Decl.)  Dr. Davidson wrote Teresa Ulus, a benefit manager for Microsoft, that Alston felt "traumatized" by this information, and Davidson requested that Alston not be required to attend a meeting with Kim that was scheduled for his first day back at work, Monday, September 15, 2003.  (*Id.*)  Alston requested that the meeting be replaced by a brief telephone discussion that avoided any topics related to his performance.  (*Id.*)  The letter stated that, "given his fragile health balance, being confined to a room for 2.5 hours while absorbing a deluge of unpleasant news must be avoided at all costs."  (*Id.*)

  Microsoft denied this request, and Alston met with Kim on September 15.  (Ex. R to Alito Decl.)  At this meeting, Kim updated plaintiff on the status of the financial services practice, upcoming engagements, business initiatives, and discussed plaintiff's mid-year review.  (*Id.*)

A few days after his return to work, plaintiff was asked to assist with an on-site project for a Microsoft client beginning on September 22. (Ex. T to Alito Decl.) Alston was informed that "the work will not exceed 40 hours a week (travel included)." (*Id.*) Microsoft avers that plaintiff objected to this assignment and that, as a result, his start at the client was postponed to September 30, 2003 (*see* Def.'s Mem. of Law in Support of its Mot. for Summ. J. at 5), but there is no record evidence to support this assertion.

On Saturday, September 27, Alston emailed James Cox, Senior Human Resources Manager, regarding his self-assessment and upcoming performance review. (Ex. V to Alito Decl.) Alston expressed concern that "Albert Kim and the overall management of the practice have already circled the wagons and I will be denied a fair review." (*Id.*) He requested that Kim be removed from overseeing his review, that plaintiff be transferred to a new department, and that he be given a week to complete the annual review. (*Id.*) Most notably, Alston proposed a "compromise solution" to his concerns over his annual review. He wrote, "[C]ould we just call this matter a draw, put out a consensus annual review, give me the 3.5 or 4.0 that I deserve and the bonus & merit increases that accompany it? Under that scenario, I would be able to return to [the client, Merrill Lynch, for] 3-4 (shortened) days a week beginning immediately, feel that I was (ultimately) treated fairly and commence my search for a new department right away." (*Id.*) Cox responded, "I am concerned with this request in that you are implying that you are agreeing to return to the client if you receive the rating you are expecting. I am sure you are aware but it is important to note that your performance is evaluated and review ratings are rewarded based on your performance relative to your peer group. 'Calling it a draw' would not be fair to you, your peers, Albert [Kim], or [Microsoft]." (*Id.*)

On the morning of September 30, Alston emailed Cox to inform him that he would not be reporting to the client that day because his blood pressure was too high. (Ex. U to Alito Decl.) Cox responded that "the important thing right now is that you address your health issues." (*Id.*) Ultimately, plaintiff worked on-site for the client for only "one to two weeks" during September and October of 2003. (Ex. A to Alito Decl. at 147:1-147:5.)

Approximately a week and a half later, on October 10, Kim met with Alston to discuss his performance review. (Ex. W to Alito Decl.) In an email to Cox, Kim described the meeting: "I gave him his review and told him to take some time to read the review. He went straight to the ratings section and looked very agitated. He said (paraphrasing) 'I see I got a 3.0'—I said 'Please read it and let's discuss . . .'—He said (paraphrasing) 'my doctor advised me for medical reasons I should not undergo a review discussion.' . . . He got up and left the office. He came back 10 seconds later and asked about his bonus. I told him his bonus is still $0 (I told him his bonus was $0 several weeks ago). He looked like he was under the impression that it would have changed since then. He walked out of the office and the office building for good. This all took place inside of one minute." (*Id.*)

### D. *Plaintiff Resumes His Leave of Absence*

Plaintiff requested, and received, a leave of absence effective October 13, 2003. (Ex. X to Alito Decl.) The first three weeks of leave were considered an extension of his paid short-term disability leave. (*Id.*) Microsoft informed plaintiff that, after three weeks, his short-term disability benefits would be exhausted, and he would be placed on Inactive (unpaid) Disability. (*Id.*) Microsoft provided plaintiff with the necessary information for completing an application for long-term disability benefits, and later submitted his application to the insurance carrier. (Exs. X, Y to Alito Decl.)

On March 29, 2004, the insurance carrier denied Alston's claim for long-term disability because Alston did not meet "the definition of disability as defined by the policy." (Ex. AA to Alito Decl.) The carrier noted that Alston claimed his disability stemmed from "hypertension, diabetes, and adjustment disorder with mixed anxiety and depression." (*Id.*) The carrier stated it had reviewed in detail the medical documentation provided by Alston and found that it did not "support any physical impairment or specific mental health impairment at the time you ceased working in April 2003." (*Id.*) It noted that there were "no diagnoses that would provide any specific restrictions or limitations" and pointed out that Alston did not visit a psychologist until November 2003—seven months after he first stopped working. (*Id.*)

  E.  *The Termination of Plaintiff's Employment for Job Abandonment*

In light of the insurance carrier's denial of Alston's claim for long-term disability benefits, Microsoft determined that he would need to return to work or submit to independent medical examinations to support his claim that he was unable to work due to a disability. (Declaration of Teresa Ulus McDade dated August 17, 2011 ("McDade Decl.") ¶ 4.) Accordingly, Ulus sent Alston a letter dated April 1, 2004 that requested that he either submit a medical release from his physician by April 12, 2004 and return to work, or report for independent medical examinations by an internist and psychologist. (McDade Decl. ¶ 4; Ex. A to McDade Decl.) This letter was sent by both express and regular mail to Alston's address at 431 West 146th Street, New York, New York. (Ex. A to McDade Decl.) This was the address plaintiff had used during his correspondence with Microsoft regarding his short-term and long-term disability leave, and it was the address he listed on his long-term disability application. (Exs. J, X, Z to Alito Decl.) In an email dated November 14, 2003, plaintiff had specifically confirmed to Ulus that "431 is still my correct address." (Ex. Y to Alito Decl.) The insurance carrier sent its decision denying plaintiff long-term disability

7

benefits to this address, and plaintiff listed it as his return address in his letter dated April 10, 2004 appealing that decision. (Exs. AA, BB to Alito Decl.) At his deposition, taken in 2009, plaintiff confirmed that this New York City address was a valid address for him in 2003 and "[i]t is still my correct New York address." (Ex. A to Alito Decl. at 182:20-25.) Plaintiff also acknowledged that the letter was delivered to his New York address, and signed for, on or around April 2, 2004. (Ex. A to Alito Decl. at 195:4-13; Ex. B to McDade Decl.)

Ulus's letter directed plaintiff to respond by April 12, 2004. (Ex. A to McDade Decl.) When he failed to do so, Ulus made additional efforts to contact him, both calling him at his residence and sending emails to his personal email account and his Microsoft email account. (McDade Decl. ¶ 6.) Plaintiff acknowledges that he saw the email from Ulus in his inbox on April 15 (Ex. A to Alito Decl. at 194:4-13), and that Ulus spoke with a member of his family by telephone (Ex. A to Alito Decl. at 197:5-16).

In spite of these efforts, plaintiff did not contact Ulus or anyone else at Microsoft. (McDade Decl. ¶ 7.) Accordingly, Microsoft considered plaintiff's failure to respond to the April 1, 2004 letter or any of the follow-up inquiries to constitute an abandonment of his employment (McDade Decl. ¶ 7; Ex. C to McDade Decl.), and terminated him effective April 15, 2004. (Ex. C to McDade Decl.) A letter informing Alston that he was terminated was sent to him by mail and by email. (Exs. C, D to McDade Decl.)

  *F.* *Procedural History*

In February 2005, Alston filed an administrative complaint against Microsoft, Kim, and Ulus, with the New York City Commission on Human Rights ("NYCCHR"), alleging race and disability discrimination in connection with his employment termination and other employment actions throughout his employment. (Ex. G to Alito Decl.) After an investigation, the NYCCHR

issued a Determination and Order dated November 15, 2007 dismissing Alston's complaint. (Ex. H to Alito Decl.)  In an extensive opinion, the NYCCHR found that "that there is NO PROBABLE CAUSE to believe that Respondents engaged in the unlawful discriminatory practices alleged." (*Id.* at 1 (emphasis in original).)  It found that Microsoft "was careful to ensure" that Alston received notice of the requirement to return to work or undergo independent medical examinations, and that this requirement was reasonable. (*Id.* at 5.)  The NYCCHR concluded that "there is no evidence that Complainant's race was a factor in Respondents' decisions as to Complainant's employment, or that Respondent unlawfully retaliated against Complainant for seeking accommodations of his disability.  The evidence supports Respondent's assertion that by failing to contact his employer, Complainant abandoned his position with Microsoft." (*Id.* at 5-6.)

Alston next filed a request for review and vacatur of the NYCCHR's Determination to the Chair of the NYCHHR. (Ex. I to Alito Decl. at 7-8.)  The review was granted and in a Determination and Order After Review dated July 17, 2008, the Commission's decision was affirmed. (*Id.* at 8.)  Plaintiff then filed a petition pursuant to Article 78 of the N.Y. C.P.L.R. in New York Supreme Court seeking to vacate the NYCCHR's determination. (*Id.*)  In an Opinion and Order dated October 6, 2009, plaintiff's petition was dismissed in its entirety on the grounds that the petition was time-barred and that it would fail on the merits even if it were not time-barred. (*Id.* at 9-12.)

In the interim, the U.S. Equal Employment Opportunity Commission ("EEOC") closed the file on plaintiff's EEOC charge of discrimination, adopted the NYCCHR's determination, and informed Alston of his right to sue in federal court. (Ex. D to Alito Decl.)

Plaintiff filed this complaint in April 2008. (Compl.)  As noted above, Judge Chin in 2009 dismissed all of plaintiff's claims except for his ADA and Title VII wrongful termination claims

9

against Microsoft Corporation. *See Alston v. Microsoft*, No. 08 Civ. 3547, 2009 U.S. Dist. LEXIS 39662 (S.D.N.Y. April 27, 2009).

## II. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment is appropriate only if the evidence shows that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Jain v. McGraw-Hill*, No. 09 Civ. 6520, 2011 U.S. Dist. LEXIS 125067, at *8 (S.D.N.Y. October 27, 2011). In determining whether a genuine dispute of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). Nonetheless, the party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" in support of its factual assertions. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

### B. *Plaintiff's Title VII and ADA Claims*

#### a. Legal Framework

Plaintiff's disability discrimination and racial discrimination claims are analyzed using the three-part framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Brown v. City of Syracuse*, 2012 U.S. App. LEXIS 5281, at *21 (2d Cir. Mar. 13, 2012) (applying *McDonnell Douglas* framework to Title VII claim); *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (applying the *McDonnell Douglas* framework to ADA claim). The *McDonnell Douglas* framework provides that, once a plaintiff makes out a prima facie case of retaliation or discrimination, the burden of production shifts to the defendant to articulate a

10

legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802-03. If the defendant produces evidence of such a reason, the plaintiff must point to evidence that would allow a reasonable factfinder to conclude that the defendant's reason is merely a pretext for discrimination or retaliation. *Id.* at 804.

> b. Plaintiff Cannot Establish that Microsoft's Reasons for Terminating Him were Pretext for Discrimination

For the purposes of this motion, the Court assumes that Alston has established prima facie cases for Title VII and ADA discrimination, and finds that Microsoft has met its burden of identifying a legitimate, nondiscriminatory reason for Alston's termination. Microsoft points to ample evidence in the record demonstrating that, after the insurance carrier denied Alston's claim for long-term disability benefits, it made efforts to arrange for Alston to return to work. (Ex. A to McDade Decl.; McDade Decl. ¶ 5-6.) Microsoft has also set forth uncontested evidence that Alston did not respond to its letter, its phone call, or its multiple emails, despite being given a two-week period in which to respond. (McDade Decl. ¶ 7.) Microsoft has therefore articulated a legitimate, non-discriminatory reason for termination—job abandonment.

The burden thus shifts back to Alston to demonstrate that the stated reason for his termination was merely a pretext for unlawful discriminatory intent. Plaintiff may "succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Plaintiff has failed to meet this burden. Alston's purported evidence of pretext is insufficient to allow a reasonable factfinder to find for him on this issue. As evidence of pretext, Alston argues that the insurance carrier's letter denying his long-term disability benefits was without merit and could not have provided a credible basis for Alston's termination. (Pl.'s Mem.

of Law in Support of Pl.'s Mot for Summ. J. at 32.) However, this letter was not the basis for Alston's termination—it merely triggered Microsoft's repeated and unavailing efforts to arrange for Alston to return to work. The basis for Alston's termination was his failure to respond to those efforts as well as his failure to return to work. (Ex. D to McDade Decl.) As Jim Cox, Microsoft's Senior Human Resources Manager, wrote Alston on April 15, "Despite Teresa [Ulus]'s efforts to reach you, you have failed to contact Microsoft or return to work with a supporting medical release. Therefore, per the letter and email sent to you, your employment is terminated effective 4/15/04." (*Id.*) The underlying merit of the insurance carrier's determination is irrelevant here and, indeed, Alston has already directly challenged that determination. (*See* Ex. BB to Alito Decl.) It was not unreasonable for Microsoft to rely on the insurance carrier's denial of benefits in making its personnel decisions. Nothing in the record suggests that Microsoft's reliance on the insurance carrier's decision was a pretext for racial or disability discrimination.

Plaintiff also contends that Microsoft's efforts to reach him demonstrate pretext. He asserts that Microsoft knew that he was living primarily in Philadelphia, presumably implying that Microsoft intentionally sent the April 1, 2004 letter to the wrong address. (Pl.'s Mem. of Law in Support of Pl.'s Mot for Summ. J. at 33-34.) There is no record evidence that suggests that Microsoft believed that plaintiff's correct mailing address was in Philadelphia. To the contrary, plaintiff used his New York address in his correspondence with Microsoft regarding his short-term and long-term disability benefits, and as late as November 2003 he had specifically confirmed to Microsoft that the New York address was correct. (Exs. J, X, Y, Z to Alito Decl.)

Plaintiff also takes issue with the emails sent by Ulus on April 13 and her phone call. He claims that the April 13 email was unreasonable because it was an "ultimatum" which provided "less than 24 hours turnaround time." (Pl.'s Mem. of Law in Support of Pl.'s Mot for Summ. J. at

37.) This argument is unavailing. Microsoft sent Alston the emails because he had already failed to respond to the April 1 letter which requested a response by April 12. The emails—rather than demonstrating pretext for discrimination—in fact demonstrate additional good faith efforts by Microsoft to contact Alston and arrange for his return to work.

Alston claims that the phone call from Ulus "could not have been designed to prevent [his] termination." (Pl.'s Mem. of Law in Support of Pl.'s Mot for Summ. J. at 38.) The record indicates that Ulus called Alston's home on April 14 and left a detailed message with a woman who answered the telephone. (Ex. C to McDade Decl.) As with the emails discussed above, the phone call—far from demonstrating pretext—indicates the additional efforts undertaken by Microsoft to contact plaintiff.

In sum, plaintiff has identified no evidence in the record that supports his contention that Microsoft's stated reason for his termination—job abandonment—was actually a pretext for racial or disability discrimination.

                c.        Plaintiff's "Failure to Accommodate" Claim is Meritless

Plaintiff also contends that his termination constituted a failure to accommodate plaintiff's alleged disability. (Pl.'s Mem. of Law in Support of Pl.'s Mot for Summ. J. at 25-31.)[3] This argument is without merit.

Discrimination in violation of the ADA includes, *inter alia*, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A); *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d

---

[3] Plaintiff also asserts that Microsoft failed to accommodate him during his return to work in September and October of 2003. (Pl.'s Mem. of Law in Support of Pl.'s Mot for Summ. J. at 29-31.) In granting Microsoft's motion for partial dismissal, Judge Chin dismissed all of plaintiff's claims relating to events occurring prior to his discharge as untimely, and held that plaintiff could pursue only his discriminatory discharge claims. (Ex. C to Alito Decl. at 15-16.) Plaintiff cannot, therefore, rely on any pre-discharge issues to support his "failure to accommodate" claim.

127, 134 (2d Cir. 2008). For the purposes of the ADA, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A plaintiff makes out a prima facie case of disability discrimination arising from a failure to accommodate by showing each of the following: "(1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (*quoting Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)). An employer can successfully respond to a prima facie claim if it shows (1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue. *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999).

Even assuming that plaintiff could make out a prima facie case, requiring Microsoft to extend an indefinite leave of absence to plaintiff is an undue hardship. The U.S. Court of Appeals for the Second Circuit has explained that where there is no indication of when an employee will return, an employer has no obligation to grant an employee "an indefinite leave of absence." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 9 (2d Cir. 1999) (*citing Walton v. Mental Health Ass'n*, 168 F.3d 661, 671 (3d Cir. 1999); *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1004 (7th Cir. 1998) ("The ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence.")). In *Walton v. Mental Health Ass'n*, the Third Circuit affirmed a district court that found that an employee's request for indefinite leave was an undue burden on the employer. 168 F.3d at 671. The plaintiff in *Walton* had been given 125 days of leave over four years, plus an additional two months of leave prior to

her termination. *Id.* The Third Circuit noted that "[a]lthough unpaid leave supplementing regular sick and personal days might, under other facts, represent a reasonable accommodation, an employer does not have to allow leave of this type to the extent that [the employer] had already granted it to [the employee]. A blanket requirement that an employer allow such leave is beyond the scope of the ADA when the absent employee simply will not be performing the essential functions of her position." *Id.*

Microsoft had already provided significant accommodations for Alston. As plaintiff himself concedes in his briefing, Microsoft made a number of significant accommodations for him, including five months of paid leave from April to September 2003, agreeing to a 40-hour work week for a one-month period in September to October 2003, agreeing to exempt him from delivering high profile presentations for that same one-month period, and another six months of leave from October 2003 to April 2004 (three weeks of which were paid). (Pl.'s Mem. of Law in Support of Pl.'s Mot for Summ. J. at 25-26; Exs. J, O, X to Alito Decl.) After Alston had been on leave for eleven months out of the past year, Microsoft reasonably and repeatedly attempted to ascertain when Alston would return to work. Alston failed to respond to all inquiries. Requiring an employer to keep an employee on an extended leave of absence with no indication of whether or when the employee will return constitutes an undue hardship under the facts of this case.

Plaintiff also takes the position that he should have been permitted to undertake independent medical evaluations before being terminated. (Pl.'s Mem. of Law in Support of Pl.'s Mot for Summ. J. at 27.) This argument is nonsensical. Microsoft's April 1, 2004 letter clearly instructed plaintiff to advise Microsoft *if* he intended to submit to independent medical evaluations. (Ex. A to McDade Decl.) Plaintiff failed to respond in any way. Microsoft is not required to infer—from plaintiff's total silence—that Alston had intentions to either return to work

15

or to undertake the medical examinations. Microsoft gave plaintiff ample opportunity to arrange for the medical examinations. Plaintiff's failure to act is not a failure to accommodate on the part of Microsoft.

## III.   CONCLUSION

Plaintiff has failed as a matter of law to demonstrate that he would be entitled to prevail on his wrongful termination claims. To the contrary, he has failed to present evidence of any genuine dispute of material fact that could allow a reasonable factfinder to find in his favor. Accordingly, this Court denies plaintiff's motion for summary judgment and grants defendant's motion for summary judgment.

Dated: New York, New York  
March 27, 2012

_____  
Sidney H. Stein, U.S.D.J.